**CIVILLE & TANG, PLLC**
330 HERNAN CORTEZ AVENUE, SUITE 200
HAGÅTÑA, GUAM 96910
TELEPHONE: (671) 472-8869/69
FACSIMILE: (671) 477-2511
EMAIL: pciville@guamattorneys.com

*Attorneys for Plaintiffs/Relators*



FILED
DISTRICT COURT OF GUAM
MAY 20 2013
JEANNE G. QUINATA
CLERK OF COURT

# IN THE UNITED STATES DISTRICT COURT OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* [UNDER SEAL], <br><br> Plaintiffs/Relators, <br><br> vs. <br><br> [UNDER SEAL], <br><br> Defendant. | CIVIL CASE NO. 13-00012 <br><br> **COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT**, 31 U.S.C. §3729, *et seq.* <br><br> **JURY TRIAL DEMANDED** <br><br> **FILED IN CAMERA UNDER SEAL** <br> (31 U.S.C. § 3730(b)(2)) |

Dated: May 20, 2013

Respectfully submitted,

**CIVILLE & TANG, PLLC**

By: _____
      *for*  **G. PATRICK CIVILLE**
EMAIL: pciville@guamattorneys.com
330 HERNAN CORTEZ AVENUE, SUITE 200
HAGÅTÑA, GUAM 96910
TELEPHONE: (671) 472-8869/69
FACSIMILE: (671) 477-2511

*Attorneys for Plaintiffs/Relators*

ORIGINAL

**CIVILLE & TANG, PLLC**
330 HERNAN CORTEZ AVENUE, SUITE 200
HAGÅTÑA, GUAM 96910
TELEPHONE: (671) 472-8869/69
FACSIMILE: (671) 477-2511
EMAIL: pciville@guamattorneys.com

*Attorneys for Plaintiffs/Relators*

IN THE UNITED STATES DISTRICT COURT OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* WILLIAM E. TOELKES and FRED J. TOELKES<br><br>Plaintiffs/Relators,<br><br>vs.<br><br>TOA CORPORATION, a Japan Corporation<br><br>Defendant. | CIVIL CASE NO. 13-00012<br><br>**COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT, 31 U.S.C. §3729,** *et seq.*<br><br>**JURY TRIAL DEMANDED**<br><br>**FILED IN CAMERA UNDER SEAL**<br>(31 U.S.C. § 3730(b)(2)) |

Plaintiffs/Relators, WILLIAM E. TOELKES and FRED J. TOELKES ("Relators"), bring this qui tam action in the name of the United States Government, against Defendant TOA CORPORATION, and allege as follows:

### CONTRACT AT ISSUE

1. The false claims alleged in this Complaint relate to United States Government contract number N62742-08-C-1301, FY08 MCON P-502 Kilo Wharf Extension at the Commander Naval Region Marianas, Main Base, Guam ("the Contract" or "the Kilo Wharf

1

Contract"), a construction project to extend Kilo Wharf, located on Naval Base Guam, having a total contract price of $84,009,018.00.

## PARTIES

2. Relator William E. Toelkes is an individual and is a resident of Guam.

3. Relator Fred J. Toelkes is an individual and is a resident of California.

4. Plaintiff, the United States of America, acting herein through the United States Navy ("Navy"), a Military Department within the Department of Defense which is a federal executive department of the United States, awarded and administered the Kilo Wharf Contract.

5. Defendant TOA Corporation ("TOA") is, and was at all times relevant hereto, a corporation organized under the laws of Japan and licensed to business on Guam.

## JURISDICTION, VENUE AND OTHER STATUTORY REQUIREMENTS

6. Relators bring this civil action for violations of 31 U.S.C. § 3729 for Relators and for the United States of America, pursuant to the provisions of 31 U.S.C. § 3730(b)(1).

7. This action arises under the laws of the United States, specifically, the False Claims Act, 31 U.S.C. §§ 3729 et seq., and this Court therefore has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

8. The contract at issue was to be performed and executed in Guam and the acts described herein which are proscribed by the False Claims Act occurred in Guam, and therefore venue in this district is proper under 31 U.S.C. § 3732(a)). Venue in this district is also appropriate under 28 U.S.C. § 1391(b)(2) and (c) in that a substantial part of the events giving rise to the claims occurred in Guam.

9. As required by 31 U.S.C. § 3730(b)(2), the Relators will be serving the United States Attorney General and the United States Attorney for the District of Guam with copies of this complaint along with a written disclosure of all material evidence and information related to the complaint. The disclosure statement supports the allegations herein of false claims against the United States by the defendants. Because the statement includes attorney-client communications and work product of the Relators' attorneys, and is being submitted to the Attorney General and to the United States Attorney in their capacity as potential co-counsel in the litigation, the Relators understand and assert this disclosure to be confidential.

10. As required by 31 U.S.C. § 3730(b)(2), this complaint is being filed in camera under seal and shall not be served on the defendants until the court so orders.

## RELATORS' STANDING

11. The allegations relating to TOA's scheme, false and deceptive statements and false claims, as set forth in this Complaint, had not been publically disclosed and were in fact not known to the United States until Relators voluntarily came forward and presented the information to the United States.

12. The Relators are the original source, within the meaning of 31 U.S.C. §3730(e)(4), of the information set forth in this Complaint pertaining to false claims.

## GENERAL ALLEGATIONS

### a. The Scheme

13. On or about October 5, 2007, the Navy, through the Naval Facilities Engineering Command Pacific, issued Solicitation N62742-07-R-1314 for a construction project to extend Kilo Wharf, COMNAVMARIANAS, Main Base Guam (the "Kilo Wharf Project").

14. The Solicitation incorporated Defense Federal Acquisition Regulation Supplement ("DFARS") DFARS 236.570(c)(1), informing prospective contractors that the award of any resulting contract was subject to the provisions of the American Preference Policy as set forth in 1997 DFARS 252.236-7010 which requires that offers submitted by firms that do not qualify as United States firms are evaluated by adding 20% to their offer.

15. As a condition of the Solicitation, prospective contractors were required to certify in their offer that they were, or were not, a "United States firm."

16. The term "United States firm" is defined in DFARS 252.236-7010(a) as follows:

(a) Definition. 'United States firm,' as used in this provision, means a firm incorporated in the United States that complies with the following:

(1) The corporate headquarters are in the United States;

(2) The corporate headquarters are in the United States; in the United States for a minimum of 2 years (if required), has filed State and Federal income tax returns (if required) for 2 years, and has paid any taxes due as a result of these filings; and

(3) The firm employs United States citizens in key management positions.

17. Because it is a Japan corporation, a proposal by TOA would have been a proposal by a non-U.S. firm. As such, had TOA submitted an offer on the Kilo Wharf Project in its own name, 20% would have been added to its offer under DFARS 252.236-7010, and TOA's offer plus the 20% would have been higher than the next lowest responsive and responsible offer.

4

18. In an effort to avoid the twenty percent assessment under DFARS 252.236-7010(b), TOA entered into discussions with International Bridge Corporation ("IBC"), an Ohio corporation, which at the time had its principal place of business in Guam.

19. TOA and IBC agreed to work together to submit an offer on the Kilo Wharf Project.

20. It was TOA's intention that a joint venture with IBC be structured on paper in such a way as to qualify the joint venture as a U.S. firm under DFARS 252.236-7010, thereby avoiding the twenty percent assessment added to offers from non-U.S. firms.

21. In furtherance of its intention to claim the benefit accorded to U.S. firms under DFARS 252.236-7010, while at the same time retaining control over the contract, TOA devised a scheme (the "scheme") whereby IBC, a U.S. firm, and TOA would deceive the United States into believing that TOA and IBC had entered into a joint venture agreement satisfying the requirements of DFARS 252.236-7010(a) thereby qualifying the joint venture as a U.S. firm under DFARS 252.236-7010.

22. The purpose of TOA's scheme was to be awarded the Kilo Wharf Contract and to claim and receive payment from the Navy.

23. Pursuant to the scheme, at TOA's insistence, as more specifically alleged below, TOA and IBC entered into a secret agreement, not disclosed to the Navy, confirming that the joint venture agreement was only nominal, i.e. a sham, and that the real relationship between the parties should the Joint Venture be awarded the Kilo Wharf Contract would be one in which TOA was the prime contractor and IBC a subcontractor.

24. In November 2007, in furtherance of this scheme to deceive the Navy and wrongfully receive the benefits of DFARS 252.236-7010, representatives of TOA including Atsushi Ando, TOA's Manager of Project Development Section, International Division and

5

Osamu Nakagome, Manager International Division and corporate Director, met with Robert Toelkes, the president of IBC, at TOA's office in Tokyo, Japan and specifically worked out the details of the scheme.

25. Notwithstanding the agreement reached during the meeting referred to in the preceding paragraph, on or about November 29, 2007, Robert Toelkes, the president of IBC, had a draft Joint Venture Agreement sent to TOA which identified IBC as the majority partner and which, contrary to the secret agreement, provided that IBC would be the managing partner of the Joint Venture with real control over the activities of the Joint Venture.

26. On November 29, 2007, in response to IBC's proposed draft joint venture agreement, Atsushi Ando, acting on behalf of TOA, responded by email, advising Robert Toelkes that the draft Joint Venture Agreement IBC had sent to TOA was inconsistent with the agreement TOA and IBC had reached one week earlier during the meeting in TOA's office in Tokyo. In his email, Mr. Ando went on to reiterate the details of the secret scheme, namely: "What we are planing (sic) on contractual matter between TOA and IBC are: (1) JV agreement (IBC 51%; TOA 49%) nominal to enjoy US preference; (2) MOU (Pre-Bid agreement) stating JVA null and void, speparate (sic) agreement (Subcontract) will be made; (3) Subcontract. We are preparing draft of the above MOU and send it for your review." Mr. Ando sent copies of his email to executives within TOA, including K. Yamashita, S. Sakurai, A. Shibata, T. Osaku and K. Arita.

27. On November 30, 2007, Mr. Ando again emailed Robert Toelkes and noted that "the JV agreement from you" contained "too much detail, especially detail the Employer does not need to know…" The Employer referred to by Ando in this email was the United States Navy. Ando sent copies of this email to the same TOA executives he had copied on the above described November 29 email.

6

28. On December 3, 2007, as part of TOA's scheme, IBC and TOA entered into a Joint Venture Agreement forming what was purported to the IBC / TOA Joint Venture ("Joint Venture"), drafted by TOA, in which IBC was listed as holding a 51% interest and TOA a 49% interest, and naming TOA as the managing partner.

29. At the time TOA and IBC signed the December 3, 2007 Joint Venture Agreement, they had secretly agreed, as part of the scheme, that the Joint Venture Agreement would have no force or effect, that TOA would control the Project as prime contractor and that IBC would only be a subcontractor on the Project. This secret agreement was never disclosed to the Navy.

30. At the time they signed the December 3, 2007 Joint Venture Agreement, TOA and IBC intended to submit the Joint Venture Agreement to the Navy as part of the scheme to deceive the Navy into believing that the purported Joint Venture was a U.S. firm under DFARS 252.236-7010. At the time the document was submitted to the Navy, TOA knew it contained false statements.

31. On December 4, 2007, one day after executing the Joint Venture Agreement, TOA and IBC executed a document titled "Pre-Bid Agreement", drafted by TOA, which stated, among other things, that "the Joint Venture Agreement signed by IBC and TOA on 3rd of December, 2007 for the Project (hereinafter referred to as the "JV Agreement") shall be superseded by this Pre-Bid Agreement and the JV Agreement shall be null and void."

32. The Pre-Bid Agreement further provided that "under consideration of actual circumstances TOA shall assume the role of the prime contractor and IBC shall undertake the role of subcontractor," and that "[T]his Agreement shall remain in full force and effect until the completion of the Project."

7

33. As of December 4, 2007 the Joint Venture between IBC and TOA ceased to exist.

### b. False Claim in Inducing Award of Contract

34. On December 5, 2007, TOA delivered proposal documents, including the December 3, 2007 Joint Venture Agreement, to the Contracting Officer for the Navy ("Contracting Officer").

35. In the December 5, 2007 submittal TOA and IBC claimed to be a joint venture and a U.S. firm by virtue of their joint venture relationship. To support this claim, and as part of the TOA's scheme to deceive the Navy and receive an evaluation that the Joint Venture was a qualified offeror and a U.S. firm within the meaning of DFARS 252.236-7010, TOA and IBC included in the submittal the December 3, 2007 Joint Venture Agreement but not the December 4, 2007 Pre-Bid Agreement.

36. The December 3, 2007 Joint Venture Agreement and the Pre-Bid Agreement were material to the determination of whether the Joint Venture qualified as a U.S. firm and whether it met the financial responsibility requirements of the Solicitation.

37. The December 5, 2007 submittal was a false statement in that TOA, acting with the intent to deceive the Navy so as to be awarded the Kilo Wharf Contract and obtain payment from the Navy, intentionally did not disclose the Pre-Bid Agreement or that the Joint Venture had been cancelled. Section 1.24 of the Solicitation and FAR 9.104 required prospective contractors to demonstrate they had adequate financial resources to comply with the Contract.

38. Between December 10, 2007 and the March 26, 2008 the Navy continued to negotiate with what it believed to be the IBC / TOA Joint Venture. At no time during this

8

Case 1:13-cv-00012 Document 1 Filed 05/20/13 Page 9 of 15

period, or after, did TOA or IBC disclose to the Navy the existence of the scheme or the fact that the Joint Venture had been nullified by the Pre-Bid Agreement.

39. On December 10, 2007, the Contracting Officer responded to the purported Joint Venture's submissions by questioning whether IBC had the financial resources to undertake the project, requiring TOA and IBC to explain the basis for the purported Joint Venture's representation that it was a United States firm, and requiring TOA and IBC to confirm that they would be jointly and severally liable on the Kilo Wharf Contract.

40. In response to the Navy's concerns, on December 13, 2007, TOA and IBC, through IBC's Robert Toelkes, represented that: (1) "all materials will be purchased by the Joint Venture," and that "the necessary working capital would be furnished by TOA corporation;" (2) TOA and IBC believed that the JV qualified as a United States firm because IBC was the majority shareholder of the Joint Venture; and, (3) TOA and IBC would be jointly and severally liable on the Contract.

41. Each of the representations described in the preceding paragraph were false statements made with the intention of deceiving the Navy and furthering the scheme, and TOA knew them to be false at the time they were made.

42. Each of the representations in the December 13, 2007 letter from the purported JV to the Contracting Officer for the Navy were material to the Navy's evaluation of the purported joint venture's offer.

43. The Contracting Officer required the representations in the December 13 letter to be specifically agreed to in writing by TOA, and in late January, 2008 TOA submitted the identical December 13, 2007 letter (keeping the same date) signed by TOA's representative, Atsushi Ando.

9

44. The December 13, 2007 letter, and its reiteration in January 2008, were false statements intended to further the scheme by TOA to deceive the Navy, to be awarded the contract and ultimately to receive money from the Navy.

45. In further response to the Contracting Officer's continued questions regarding the purported joint venture's claim to be a U.S. firm, TOA caused to be submitted to the Contracting Officer a letter on January 15, 2008 representing that United States citizens would hold key roles in the management of the joint venture and attaching an organizational chart depicting IBC's Robert Toelkes and Relator William Toelkes as members of the Joint Venture Management Committee.

46. In the organizational chart, Relator William Toelkes was named as an alternate IBC representative on the Joint Venture Management Committee.

47. Relator William Toelkes had not been told about and was unaware of the Pre-Bid Agreement specifically or the scheme in general.

48. This representation regarding the Management Committee was false, and TOA knew it was false at the time it was made. As part of the scheme, the Management Committee was a fiction designed to deceive the Navy into believing that the Joint Venture qualified as a U.S. Firm under DFARS 252.236-7010.

49. In reality, and in accordance with the scheme, TOA exercised complete control over the purported Joint Venture. Although the Joint Venture Agreement provided for a Management Committee on which IBC was a member, there was never a Management Committee, except on paper. The management of the purported Joint Venture was at all times controlled by TOA. The TOA representatives controlling the purported Joint Venture were non- U.S. citizens.

10

50. The representations in the January 15, 2008 letter were material to the Navy's evaluation of the purported joint venture's offer.

51. On January 23, 2008 the Contracting Officer again wrote the purported joint venture and asked for additional information, including further information to justify the claim that the Joint Venture qualified as a U.S. firm.

52. In addition to concerns over whether the purported Joint Venture was a U.S. firm, the Contracting Officer had ongoing concerns regarding IBC's financial capability to undertake the Project.

53. In response to the Navy's ongoing concerns regarding whether the purported joint venture was a U.S. firm, and regarding IBC's financial capability to undertake the project, TOA and IBC executed a second Joint Venture Agreement on January 28, 2008.

54. The January 28, 2008 Joint Venture Agreement closely tracked the December 3, 2007 Joint Venture Agreement, but added language further meant to deceive the Navy into believing that TOA would provide working capital for the project.

55. The January 28, 2008 Joint Venture Agreement contained no language purporting to nullify the Pre-Bid Agreement.

56. When TOA decided to register the Joint Venture with the Government of Guam on May 23, 2008, it was the December 3, 2007 Joint Venture Agreement TOA caused to be filed with the Government of Guam Department of Revenue and Taxation, notwithstanding the fact that the December 3, 2007 Agreement had been specifically nullified voided by the Pre-Bid Agreement on December 4, 2007.

57. The January 28, 2008 Joint Venture Agreement, like the December 3, 2007 Joint Venture Agreement, was a sham and was part of the scheme described above to deceive the Navy into awarding the purported Joint Venture the contract.

11

58. It was at all times TOA's intention that the true nature of the relationship between TOA and IBC would be that of TOA as prime contractor and IBC as subcontractor, as set forth in the November 29, 2007 email from Atsushi Ando to Robert Toelkes, and as set forth in the December 4, 2007 Pre-Bid Agreement.

59. As part of the scheme between TOA and IBC in which TOA would assume the role of prime contractor and IBC the role of subcontractor, TOA knew that it would require IBC to pay for materials used on IBC's scope of work and that it would require IBC to supply the capital necessary to carry out IBC's scope of work.

60. TOA's representations to the Navy that it would supply the necessary working capital for the entire project, and purchase materials needed by the Joint Venture, were false statements made for the purpose of deceiving the Navy into believing that the JV was a responsible offeror.

61. The representations were false at the time they were made and TOA knew the representations to the Navy were false at the time they were made.

62. TOA's false statements that it would provide working capital for the Project were material to the Navy's determination that the Joint Venture was a responsible contractor and decision to award the purported Joint Venture the Contract.

63. On January 31, 2008, TOA, through the purported Joint Venture, submitted a letter to the Navy responding to the Navy's ongoing concerns as outlined above. In the response, TOA and IBC represented that "The joint venture is overseen by a management committee made up of two members from IBC and two members from Toa Corporation." This was a false statement at the time it was made and TOA knew it to be a false statement.

64. The January 31, 2008 submittal by TOA and IBC contained multiple exhibits.

12

Case 1:13-cv-00012 Document 1 Filed 05/20/13 Page 13 of 15

65. The purpose of the forgoing false statement was to further the scheme and deceive the Navy into believing that the JV qualified as a U.S. firm within the meaning of DFARS 252.236-7010.

66. TOA represented to the Navy that it would be jointly and severally liable on the Contract with IBC.

67. Additionally to, and independent of, TOA's express representation that it was jointly and severally liable with IBC under the Contract, TOA and IBC are jointly and severally liable under the express provisions of the Award of Contract, Form 1442 and under the partnership laws of Guam.

68. On or about January 31, 2008 the purported IBC / TOA Joint Venture submitted a final negotiated Joint Venture Offer ("Offer"), which was subsequently amended, for a total offer of $83,838,018, plus an optional item at $171,000.

69. Under the Representations and Certifications submitted as part of the Offer, the purported Joint Venture certified itself as a Unites States firm as defined by DFARS 252.236-7010 and thus not subject to the additional 20% cost evaluation factor applied to non-U.S. firms. This representation was false at the time it was made and TOA knew it to be false.

70. The proposal by the purported Joint Venture was accepted by the Navy as a proposal from a U.S. firm. Accordingly, the Contracting Officer for the Navy did not add 20% to the purported Joint Venture's proposal under DFARS 252.236-7010.

71. On March 26, 2008 the Navy awarded Contract N62742-08-C-130 to the "IBC/TOA Joint Venture" with a contract value $83,838,018.00. The Navy subsequently exercised an option for additional work, increasing the contract value to $84,009,018.

72. In making the Award, the Navy specifically accepted the purported Joint Venture's qualification and price proposals submitted on December 5, 2007, which contained

13

Case 1:13-cv-00012 Document 1 Filed 05/20/13 Page 14 of 15

the December 3, 2007 Joint Venture Agreement but not the December 4, 2007 Pre-Bid Agreement, and which contained the revised proposals of January 15 and 31, 2008, amendments of proposal dated February 21 and 27, 2008 and Final Proposed Revisions of March 6, 2008.

73. None of the purported Joint Venture's submissions disclosed TOA's scheme, or made reference to or contained copies of Ando's emails of November 29, 2007, or the Pre-Bid Agreement. None of the submissions by the purported Joint Venture advised the Navy of the agreement between TOA and IBC that the true nature of their relationship would be that of TOA as prime contractor and IBC as subcontractor.

74. At no time, before or after the award of the contract, did TOA or IBC inform the Navy that they had entered into a secret agreement under which the real relationship between TOA and IBC was that of TOA as prime contractor and IBC as subcontractor, under which the JV would be a nominal entity controlled completely by TOA, under which TOA was only responsible for providing working capital for the portion of work it performed and IBC was solely responsible for providing the working capital for the portion of the work it performed, and under which all key management positions would actually be held by citizens of Japan and not by United States citizens.

75. The false and deceptive statements and the omissions by TOA, as set forth above, were material in deceiving the Navy into awarding the Kilo Wharf Contract to the purported Joint Venture.

### c. False Statements In Keeping Contract

76. At least one U.S. firm submitted a responsive offer, to wit: the Watts-Healy Tibbets A JV. ("Watts-Healy").

14