# THE DISTRICT COURT OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel* William E. Toelkes and Fred J. Toelkes,<br><br>Plaintiffs,<br><br>vs.<br><br>TOA CORPORATION,<br><br>Defendant. | CIVIL CASE NO. 13-00012<br><br><br>**DECISION AND ORDER REGARDING RELATORS' SHARE UNDER FALSE CLAIMS ACT** |

The government has settled this False Claims Act ("FCA") case against defendant TOA, but disputes the percentage of the settlement to be awarded to relators William ("Bill") and Fred Toelkes, who filed the complaint and brought an apparently substantial fraud to the government's attention. The parties submitted briefs in support of their proposed awards and the court heard argument on November 6, 2017. At the conclusion of the hearing, the court granted the relators' request for an award of twenty-five percent of the settlement proceeds and noted a written decision memorializing the award and its justifications would follow.

**I. BACKGROUND.**

Bill Toelkes played equal parts birddog and bulldog in this case, featuring what appears to have been sizable fraud perpetrated on both the United States and Guam's local economy. The

government secured its $3,100,000 settlement for the apparent fraud with Japanese corporate entity TOA, thanks largely to (1) Bill's initiation[1], as a "relator," of a lawsuit against TOA on behalf of the United States under the FCA, 31 U.S.C. § 3729–3733, and (2) his associated development and provision of information establishing TOA's liability for fraud in procuring substantial government contracts for construction work at the Naval base here on Guam.

Bill uncovered a scheme by which TOA had created a sham joint venture with a much smaller American entity so as to qualify for a twenty-percent "American Preference" in government contract bid evaluation. Despite a nominal joint venture arrangement, Bill discovered, TOA intended to retain and did retain virtually complete, if not total, control of the operation—facts which, if known, would have rendered TOA ineligible for the bid preference.

And TOA's scheme had succeeded at first. TOA received the twenty-percent preference, won its bid for the construction work on the wharf at the Naval base, and went to work. But Bill eventually discovered emails and other documentary evidence establishing the fraud and quickly consulted counsel. His counsel contacted Guam's local U.S. Attorney's Office, but after initial consultation and investigation, the U.S. Attorney's Office declined to pursue the investigation further.

Bill was undeterred. He gathered additional evidence and support, and he later filed a complaint describing TOA's fraud in this court, as envisioned and encouraged by the FCA's private enforcement provision, in May 2013. Based on the information Bill provided in the complaint and additional disclosures he had taken the time to prepare, the government decided to revisit its investigation. As it investigated, the government asked the court for additional time to evaluate the information and to decide whether to intervene and lead the prosecution of the case. Some four years

---

[1] Bill's son Fred was added as a relator in this action largely for practical reasons related to Bill's advanced age.

and fifteen deadline extensions later, the government finally intervened and gave notice of the settlement it had reached with TOA.

The parties have since stipulated to the dismissal of the claims Bill brought against TOA and other related claims. All that remains for resolution is a determination of what percentage of the settlement proceeds the relators should receive for their contributions to the discovery of and recovery for TOA's fraud.

Section 3730(d) of the FCA directs that for cases like this one, where relators have initiated a case and the government eventually intervenes, the relators are entitled to receive at least fifteen percent, but not more than twenty-five percent, of any amount eventually recovered. 31 U.S.C. § 3730(d)(1). The determination, section 3730(d) adds somewhat tersely, shall depend "upon the extent to which the [relators] substantially contributed to the prosecution of the action." *Id.*

The parties vigorously dispute where within the statutory range the appropriate award should fall here. The government contends a seventeen percent share is warranted, attempting to minimize Bill's role in securing the final recovery and emphasizing the importance of its own protracted, extensive, and sometimes resource-intensive investigation. Bill, by contrast, maintains a twenty-five percent share is appropriate, highlighting the quality of the information he provided and the dogged determination he and his counsel exhibited despite sometimes dismissive government counterparts. Also counseling in favor of a larger award, he adds, are the prominent purposes of the FCA and a need for additional private enforcement effort on Guam.

**II. ANALYSIS.**

Congress substantially overhauled the FCA in 1986, with an avowed aim of "enhanc[ing] the Government's ability to recover losses sustained as a result of fraud against the Government." S. Rep. 99-345, 1, 1986 U.S.C.C.A.N. 5266. The Act had been adopted during the Civil War to combat fraud and price-gouging in war contracting. *See U.S. ex rel. Springfield Terminal Ry. Co. v. Quinn*,

14 F.3d 645, 649 (D.C. Cir. 1994). It was founded on an underlying principle "as old as modern civilization"—namely, "that one of the least expensive and most effective means of preventing frauds on the treasury is to make the perpetrators of them liable to private persons acting" on hopes of financial or other gain. *United States v. Griswold*, 24 F. 361, 366 (D. Or. 1885). In its early years, the FCA was broadly effective in uncovering fraud in Civil War contracting, offering shares of as much as fifty percent of any amount finally recovered to those individuals—called relators—filing successful suits on behalf of the United States. *See, e.g., id.* at 363. The Act fell into disuse in the ensuing decades, and it reentered the national consciousness again only in the 1940s, as government contracting boomed during World War II. *See Quinn*, 14 F.3d at 649. Congress was at that point compelled to tighten some of the Act's provisions, so as to ensure relators would not abuse its privileges and bring suits based on conduct already known to the public, which had become a problematically popular practice during the war. *Id.* But the effect of the tightening amendments over time was devastating. By the 1980s, the Senate Judiciary Committee reported, "sophisticated and widespread fraud" was depleting the treasury, and "only a coordinated effort of both the Government and the citizenry" as contemplated by the 1986 FCA amendments could adequately address the problem. S. Rep. 99-345 at 1–2. Fraud by that point may have been draining as much as $100 billion annually from the treasury, or as much as ten percent of the federal budget, and the crisis called for various new incentives and deterrents. *Id.* The "sad truth," the Judiciary Committee concluded, was "that crime against the Government often d[id] pay," because "government agencies, by themselves, were unable to ensure accountability on the part of program recipients and government contractors." *Id.*

And thus the Committee called for, and Congress eventually passed, various amendments meant to marshal far more substantial private enforcement efforts, such as: increasing monetary rewards for relators, adding a treble damages provision, guaranteeing awards to relators except in

4

very limited circumstances, adding whistleblower protection, making attorney's fees recoverable from culpable government contractors, diminishing the burden of proof for relators, and providing for a continuing role for relators in litigation even in the event of government intervention. *See Quinn*, 14 F.3d at 651. These 1986 amendments, the Ninth Circuit later observed, were designed to promote a singular overarching purpose: "to encourage more private enforcement suits" to combat fraud. *United States v. Northrop Corp.*, 59 F.3d 953, 963 (9th Cir. 1995) (quoting S. Rep. 99-345). Congress sought, the *Northrop* court added, "to create the greatest incentives for those relators best able to pursue claims that the government could not, and bring forward information that the government could not obtain." *Northrop Corp.*, 59 F.3d at 963–64. And specifically relevant for purposes of determining an appropriate relators' share, the legislative history makes clear, is the notion that increased incentives in the form of increased awards for relators "allows and encourages assistance from the private citizenry that can make a significant impact on bolstering the Government's fraud enforcement effort." S. Rep. 99–345 at 8; *see also United States ex rel. Barajas v. Northrop Corp.*, 258 F.3d 1004, 1012 (9th Cir. 2001).

Recognizing this fundamental goal of encouraging private enforcement, various courts have explained the minimum fifteen percent share contemplated by section 3730(d) is to be viewed as a "finder's fee," and the legislative history notes that compensation is to be paid to the relator even where the relator "does nothing more than file the action in federal court." 132 Cong. Rec. H9382–03 (Oct. 7, 1986) (Westlaw ed.) (statement of Rep. Berman); *see, e.g., U.S. ex rel. Alderson v. Quorum Health Grp., Inc.*, 171 F. Supp. 2d 1323, 1331 (M.D. Fla. 2001). The government does not dispute that Bill did far more than merely file an action here, but it nonetheless suggests he is not entitled to much more than statutory minimum, relying largely on the fact of its own investigation—after Bill had provided his critical information and eventually filed suit—as its justification for a diminished share.

But the legislative history for section 3730(d) suggests Congress envisioned a different analysis for the typical case. The history for the House version of the 1986 amendment to the section explains that in "[c]ases where the person carefully develops all the facts and supporting documentation necessary . . . and where that person continues to play an active and constructive role in the litigation that leads ultimately to a successful recovery . . . the Court should award a percentage substantially above 15% and up to 25%." 132 Cong. Rec. H9382–03 (Oct. 7, 1986). The history for the Senate version of the amendment develops substantially similar considerations somewhat more discretely, identifying the following factors guiding the determination: the significance of the information provided to the government; the contribution by the relator to the result; and whether the information in the suit provided by the relator was previously known to the government. S. Rep. 99–345 at 28.

In the typical case, the courts have often evaluated the Senate and House histories in tandem. *See, e.g., Alderson*, 171 F. Supp. 2d at 1332; *cf. U.S. ex rel. Johnson Pochardt v. Rapid City Reg'l Hosp.*, 252 F. Supp. 2d 892, 897 (D.S.D. 2003). The first House and Senate factors, the courts have observed, consider the significance of the information provided, and the relators' development of that information. *See Alderson*, 171 F. Supp. 2d at 1332. Application of those factors here suggests Congress envisioned a higher-end share for relators like Bill. *See, e.g., United States v. General Elec.*, 808 F. Supp. 580, 583 (S.D. Ohio 1992). The government has conceded, both in its brief and at argument, that Bill made substantial "efforts in the initial collection and organization of documents for disclosure" and adds that Bill's revelation of the "true organizational structure" of the apparently fraudulent joint venture was essential to the prosecution of the case. And as Bill contends and the government does not dispute, he and his counsel spent numerous hours "reviewing documents, conducting legal research and organizing the documents and arguments which established" the criminal and civil liability ostensibly driving the settlement, he and his counsel spent hundreds more

"compiling documents, analyzing data, and" collating information for the government as the investigation progressed, and his counsel spent yet more time in consultation with the government as the TOA defendants raised various defenses. Those contributions alone suggest a maximal share may be appropriate. *See, e.g., Johnson Pochardt*, 252 F. Supp. 2d at 898 (awarding twenty-four percent share where "the large amount, the detailed nature, and the steady flow of information indicate[d] that [the relator] significantly contributed to the government's knowledge"). The government of course developed additional facts and supporting documentation, some of it independently from a related bid protest case in which a losing bidder had challenged TOA's bid—but that should not diminish the quality and development of the information provided by the relators. *See, e.g., Alderson*, 171 F. Supp. 2d at 1331 (awarding twenty-four percent share despite fact government "led the effort to obtain" vast discovery). The first House and Senate factors thus suggest Bill's contributions to the successful settlement here were substantial, and Congress thus likely envisioned an award at the top end of the statutory range.

The second House and Senate factors task the court in the typical case with assessing the relators' contribution to the result. *Alderson*, 171 F. Supp. 2d at 1332. The result here was a 3.1 million dollar settlement after a multi-year investigation by the government. In other cases, the court notes, large awards based on contribution have often been made after relators, or relators' counsel, have remained intimately involved in the investigation, have participated or even led settlement discussions, and have, at times, resuscitated cases the government may have intended to drop. *See, e.g., id*. at 1336 ("On at least two occasions, the United States openly signaled its intention to decline prosecution[.]"); *Johnson Pochardt*, 252 F. Supp. 2d at 898 ("When the government decided not to intervene, the relator and his attorneys persuaded the government to continue with the investigation."). The history here is difficult to evaluate based on this factor alone, because after developing and providing the initial crucial information, Bill apparently met with government attorneys for a debrief

7

on just one occasion, and government attorneys were both before and after that less openly receptive to the contributions of Bill and his counsel. But much as was the case with the first factors, the government's own efforts cannot erase the efforts Bill and his counsel actually made—and where a relator perseveres in the face of initial dismissiveness by the government, and where counsel make every effort to remain involved even after the government has picked up the investigation, the cases suggest the contribution considerations counsel in favor of larger shares. *See, e.g., Johnson Pochardt*, 252 F. Supp. 2d at 898 ("For two years, Johnson Pochardt assisted the government in building a case against the defendants, and her persistence ultimately persuaded the government to intervene."). The contribution considerations thus suggest a high-end award may be appropriate here.

The last legislative history factor, identified in the Senate history alone, calls in the typical case for a determination of whether the information in the suit provided by the relator was previously known to the government. *See, e.g., id*. at 899. And by its own admission, the government had no prior knowledge of the information Bill provided here, and that information was instrumental in driving the successful settlement. Other courts have observed disclosure of previously unknown information in this way should alone counsel in favor of a relatively greater award. *See, e.g., id*. at 899; *United States v. Gen. Elec*., 808 F. Supp. 580, 582 (S.D. Ohio 1992) (emphasizing agent admission that prosecution would not have happened without the information provided by the relator). Application of this factor by itself, in other words, may justify an award significantly larger than the government asks for here.

The court notes the parties have also cited guidelines the government has developed internally for making share determinations and notes other courts have cited these guidelines in passing. *See, e.g., U.S. ex rel. Fox v. Nw. Nephrology Assocs., P.S.*, 87 F. Supp. 2d 1103, 1111 (E.D. Wash. 2000). But as many courts have observed, the guidelines both "fail to establish a coherent theory under which to determine the relator's share," and seem intentionally designed to give equivocal guidance at

best, so as to support a range of government contentions. *See, e.g., Alderson*, 171 F. Supp. 2d at 1335. Regardless, straightforward application of the government's proposed factors here largely tracks the application of the legislative history considerations, because as the government concedes, Bill developed and provided extensive and previously unknown information essential to the prosecution of the case, and he and his counsel made significant contributions to the successful negotiation of settlement. *See, e.g., id*. ("Although equivocal and somewhat unresponsive to the particulars of this case, the DOJ guidelines, fairly applied, suggest forcefully that Alderson is entitled to a robust share of the settlement proceeds."). Application of the government's proposed factors, in short, suggests Bill is entitled to an award at the higher end of the statutory range.

The typical analysis thus suggests Bill is entitled to a substantial share of the settlement. But this was not the prototypical statutory case, Bill was not the typical relator, and the standard lenses sharpen the award analysis here only imperfectly. Several additional features of this case guide the court's evaluation of the section 3730 language and its application to the relators' contributions here.

Various courts have observed that it is unfortunate, and potentially problematic, that despite a successful investigation and eventual settlement, the relators and the government should now take such antagonistic positions. *See, e.g., Gen. Elec*., 808 F. Supp. at 584 ("This is not the first case where this Court has noted the antagonism of the Justice Department to a whistleblower."); *see also Alderson*, 171 F. Supp. 2d at 1340 ("[T]roubling is the adversarial position in which the United States and Alderson find themselves with respect to determination of the relator's share."). The rift is clearly at odds with the statutory design: as the Judiciary Committee made clear, "only a coordinated effort of both the Government and the citizenry will decrease this wave of" fraud on public funds. S. Rep. 99-345 at 2. The concept of monetary reward for the kind of disclosure made here is nothing new—the FCA is now one hundred fifty-four years old, the IRS has "for decades offered a monetary reward to anyone who provides information regarding tax evasion," and various other agency
9

practices of compensating whistleblowers abound. *Gen. Elec.*, 808 F. Supp. at 583. Congress, the courts agree, long ago made the determination that the FCA should "set up incentives to supplement government enforcement," and the executive's longstanding practice of undercutting those incentives is surely cause for concern. *See, e.g., Northrop Corp.*, 59 F.3d at 963; *accord* S. Rep. 99-345 at 25 ("Current law presents an often times self-defeating 'all or nothing' proposition both for the person bringing the action and for the government."). Given this longstanding practice and no sign of change, it may be that larger awards are necessary, at least in the short term, to re-focus the award determination on the actual language and purpose of the statute and the 1986 amendments. As the *General Electric* court observed, larger awards are clearly justified where a relator uncovers fraud and the government recovers—regardless whether the relator receives the maximum award, the government comes out ahead as compared to the scenario where no disclosure is made, and that is exactly what the 1986 amendments sought to accomplish by offering larger awards. *Gen. Elec.*, 808 F. Supp. at 584.

Bill's successful navigation here of what might also be described as an obstacle course of unenthusiastic participants also counsels in favor of a maximal award. Various courts, as noted above, have given this kind of persistence significant weight in the award determination. *See, e.g., Alderson*, 171 F. Supp. 2d at 1338 ("Only his dogged resolution, eventually supported by competent professionals and an occasionally reluctant government, resulted in the millions now available for distribution."). Any number of circumstances may explain the government's initial hesitation in this case and others, but as the Judiciary Committee recognized, it is often the very existence of those circumstances that counsels in favor of larger awards, as incentives for private enforcement. *See, e.g.,* S. Rep. 99-345 at 26 ("[T]he often heavy, sporadic workload of Government may create a situation where a qui tam plaintiff is better able to conduct the litigation in a timely manner."). That the government took more than five years here to reach a result apparently far less favorable than the

relators had envisioned long before suggests both the local U.S. Attorney's Office and the Department of Justice (DOJ) remain trapped in the situation the 1986 amendments aimed to avoid, and it may well be that the statutory language envisions larger awards to remedy the problem. *See id*. (describing proposed amendments as "a check that the Government does not neglect evidence, cause undue delay, or drop the false claims case without legitimate reason").

And the initial dismissiveness and delay highlights a larger problem specific to the district here. The 1986 amendments have been broadly successful in increasing discovery of and recovery for fraud in government contracting elsewhere—as of October 2016, DOJ statistics suggest the government has recovered at least $53 billion in taxpayer dollars under the FCA since the 1986 amendments. *See* DOJ Fraud Statistics – Overview, at 2 (Dec. 13, 2016), available at https://www.justice.gov/opa/press- release/file/918361/download. But as the parties agree, this case, featuring a settlement of $3,100,000, may represent the first successful FCA recovery in the history of this district. If not, the government has noted, the number of successful recoveries here is probably countable on a single hand. But that is an alarming concession. Given the size of the government contracting industry here on Guam, given the estimates of the prevalence of fraud identified by the Judiciary Committee, the Government Accountability Office, and the DOJ, given the history of substantial post-1986 recovery in other districts around the country, and in the absence of any explanation offered for why so few investigations and prosecutions have been made, it appears the statute is not operating as intended here. *See, e.g.,* S. Rep. 99-345 at 3 (attributing pervasiveness of fraud to lack of government's ability to effectively monitor and deter and pushing for additional incentives for private enforcement); *accord U.S. ex rel. Shea v. Verizon Commc'ns, Inc*., 844 F. Supp. 2d 78, 92 (D.D.C. 2012) (noting that in the absence of private enforcement effort, "the fraudulent conduct might well never have been discovered and understood" and adding "worst of all, it would very likely have continued far into the future"). It may merely be a sign that the prevalence of fraud

11

here is much diminished as compared to other districts nationwide. But more likely, that this was probably the first successful recovery on Guam, and that the U.S. Attorney's Office was initially recalcitrant despite the quality of information Bill offered, suggest enhanced awards are necessary to enlist private parties to assist in bearing the burden of otherwise inadequate enforcement here. *See, e.g.,* S. Rep. 99-345 at 28 ("If a potential plaintiff reads the present statute and understands that in a successful case the court may arbitrarily decide to award only a tiny fraction of the proceeds to the person who brought the action, the potential plaintiff may decide it is too risky to proceed in the face of a totally unpredictable recovery."). The legislative and local histories taken together, in other words, suggest larger awards may be necessary here, at least in the short term, to tackle what remains a problem largely unaddressed even three decades after its identification. S. Rep. 99-345 at 2 ("This growing pervasiveness of fraud necessitates modernization of the Government's primary litigative tool for combating [it]").

### III. CONCLUSION.

Government contracting is no small part of Guam's economy. The proceeds of these contracts sustain businesses and families throughout the district. The scourge of fraud in the industry has both devastating and pernicious effects on the U.S. treasury and thus almost by definition on the vitality of the local economy. Congress took steps to bolster the public–private partnership to eliminate the scourge nationwide in 1986, and elsewhere, it appears quite credibly that the effort has produced at least some of its intended effects. Whether the partnership has been reinvigorated in the same way here on Guam is doubtful. And the history of this case may illustrate the failure in microcosm: Bill uncovered powerful evidence of sizable fraud, was met with initial dismissiveness by the government, pursued the case on his own, was sidelined and waited several years as the government eventually investigated the case, watched as the government settled the case for much less than he thought it worth, and now finds himself fighting for a share of the proceeds to which the

FCA tells him he is entitled. But the point of the 1986 amendments, all agree, was to eliminate this kind of antagonism and to marshal far more individual efforts to share the burdens of detection and enforcement with the government. In scenarios where the government is not up to the task, as appears to be the case here, Congress's solution was clear: "increase[d] incentives, financial and otherwise, for private individuals," to "encourage more private enforcement" and to resuscitate use of the FCA as "a more useful tool against fraud in modern times." *See* S. Rep. 99-345 at 1.

Those considerations coupled with the traditional considerations—the quality of his information, his continued, patient, often dogged participation, and the lack of the government's initial awareness of the fraud—compel the court to conclude Bill's contributions to the successful settlement were both substantial and essential, and that an award of the maximum allowable share here is equitable, just, and both consistent with and necessary to effectuate in this district the FCA's very plain statutory language, history, and purpose. The court therefore orders that the relators are entitled to twenty-five percent of the $3,100,000 settlement, the maximum allowable share under the statute, which amounts to $775,000.

**SO ORDERED.**



**/s/ Frances M. Tydingco-Gatewood
  Chief Judge
Dated: Nov 17, 2017**